Geoffrey S. Brounell (Bar ID No. 326522)
1251 Avenue of the Americas, 42nd Floor,
New York, NY 10020-1104
212.603.6404
geoffreybrounell@dwt.com

Jeremy Ben Merkelson (*Pro Hac Vice Submitted)*
Patrick T. Wilson (*Pro Hac Vice Forthcoming*)
1301 K Street NW, Suite 500 East,
Washington, D.C. 20005
202.973.4283
jeremymerkelson@dwt.com
patwilson@dwt.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRIGHTVIEW LANDSCAPES, LLC,**<br>980 Jolly Road, Suite 300, Blue Bell,<br>Pennsylvania 19422<br><br>Plaintiff,<br><br>v.<br><br>**HENRY BAILEY,**<br>412 Lake Moultrie Drive<br>Bonneau, South Carolina 29431<br><br>Defendant. | Civil No. |

**VERIFIED COMPLAINT**

Plaintiff BrightView Landscapes, LLC ("BrightView" or "Plaintiff"), by and through undersigned counsel, brings this Verified Complaint against Defendant Henry Bailey ("Bailey" or "Defendant"), and in support thereof states as follows:

## INTRODUCTION

1. This is an action for breach of contract seeking injunctive relief and damages arising from Bailey's knowing and intentional violation of his post-employment restrictive covenants contained in the Confidentiality, Noncompetition, and Nonsolicitation Agreement that he executed as a condition of his employment with BrightView (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

2. BrightView is a leading commercial landscape services company headquartered in Blue Bell, Pennsylvania that serves customers nationwide. BrightView connects with customers through its Account Managers, who directly interact with and manage the relationship.

3. BrightView hired Bailey as an Account Manager in its Charleston, South Carolina branch and entrusted him with primary responsibility for valuable customer relationships, contracts, and confidential business information associated with the portfolio of client accounts he managed on BrightView's behalf, referred to within the company as his assigned "book of business."

4. As part of his employment, BrightView provided Confidential Information and Trade Secrets (as defined in the Agreement) to Bailey, along with specialized training necessary to do his job. In turn, Bailey agreed, among other things, that (a) for one (1) year following the termination of his employment he would not be employed by or participate in a Competing Business within his Restricted Territory in a role involving the same or substantially similar services he provided to BrightView; (b) for two (2) years following the termination of his employment he would not solicit, divert, or appropriate (or accept any business from ) any BrightView Customer with whom he had Material Business Contact; and (c) he would never use

or disclose BrightView's Confidential Information or Trade Secrets except in the performance of his duties for BrightView.

5. On February 28, 2026, Bailey informed his then-manager Damien McDonagh that he would be resigning from BrightView to accept a position with Bridgewater Land Group ("Bridgewater"). He refused at that time to provide any details about the job, leaving BrightView unsure of whether he was going to service areas outside of the Restricted Territory or solicit a wholly different customer base than those within his assigned book of business at BrightView.

6. Several months later, in May 2026, BrightView discovered that both before leaving BrightView and while working at Bridgewater, Bailey has secretly solicited Oyster Point, an important residential and commercial customer consisting of four accounts within Bailey's BrightView book of business, to terminate its relationship with BrightView and sign instead with Bridgewater and Bailey.

7. Bailey was successful in soliciting Oyster Point. BrightView lost four accounts associated with this six-year customer, which collectively represented approximately **$293,898** in annual contract value alone.

8. Bailey continues to violate his Agreement. Just recently, BrightView received a second customer's notice of termination, and another customer that Bailey had material contact with at BrightView. BrightView has good reason to believe Bailey is actively pursuing additional BrightView customers and taking steps to damage its goodwill in the Restricted Territory.

9. Bailey is utilizing BrightView's specialized training he received from BrightView to further his efforts to compete with his former employer.

10. Bailey has violated his Agreement and damaged BrightView. Monetary relief alone is not enough to compensate BrightView for Bailey's misconduct. Immediate injunctive relief is

necessary to stop Bailey from continuing to violate his contractual obligations and engaging in unfair competition to diminish BrightView's customer relationships and goodwill.

## PARTIES

11. Plaintiff BrightView Landscapes, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 980 Jolly Road, Suite 300, Blue Bell, Pennsylvania 19422 in Montgomery County, within this District.

12. BrightView's executive officers work from its Blue Bell headquarters, and strategic decisions regarding the Company's operations are made there.

13. For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of each of its members. The sole member of BrightView Landscapes, LLC is BrightView Holdings, Inc., a corporation organized under the laws of the State of Delaware with its principal place of business in Blue Bell, Pennsylvania. Accordingly, BrightView is a citizen of Delaware and Pennsylvania.

14. Defendant Henry Bailey is an adult individual who resides at 412 Lake Moultrie Drive, Bonneau, South Carolina 29431. Bailey is domiciled in, and is a citizen of, the State of South Carolina.

## JURISDICTION, VENUE, AND CHOICE OF LAW

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between the parties as Plaintiff is a citizen of Delaware and Pennsylvania and Defendant is a citizen of South Carolina and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

16. Among other things, as a direct result of Bailey's breaches, BrightView has already lost multi-year customer accounts with annual contract values of approximately $293,898, and the value to BrightView of enforcing the restrictive covenants against Bailey exceeds $75,000, exclusive of interest and costs.[1]

17. This Court has personal jurisdiction over Bailey because Bailey expressly consented and stipulated to the jurisdiction of this Court. Section 12 of the Agreement, entitled "Jurisdiction, Forum Selection, and Choice of Law," provides in relevant part:

> The parties agree that any and all actions or proceedings by BrightView to enforce this Agreement may be brought in the State and/or Federal Courts located in or serving Blue Bell, Pennsylvania . . . . Each party hereby waives any right it may have to assert the doctrine of forum non conveniens or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this Section, and stipulates that the State and Federal courts located in or serving Blue Bell, Pennsylvania shall have in personam jurisdiction and venue over each of them for the purpose of litigating any dispute, controversy, or proceeding arising out of or related to this Agreement.

18. Blue Bell, Pennsylvania is located in Montgomery County, Pennsylvania, within the Eastern District of Pennsylvania. This Court is a "Federal Court[] located in or serving Blue Bell, Pennsylvania" within the meaning of Section 12 of the Agreement.

19. The Agreement was presented to Bailey before the start of his employment, in exchange for the offer of employment and as a material condition of working in a customer-facing account management role with BrightView. Bailey was provided a reasonable and adequate amount of time to review its terms and to consider them before he decided to execute the Agreement.

[1] This matter is not subject to mandatory arbitration under Local Rule 53.2 because monetary damages are greater than $300,000.

20. Bailey was advised in a bold, capitalized statement in the Agreement to review or consult with an attorney of his choice before executing the Agreement. *See* Ex. A at 7.

21. In this jurisdiction, a forum selection clause is presumptively valid and enforceable, and a party's contractual consent to jurisdiction independently satisfies due process. Bailey's consent and stipulation to personal jurisdiction in Pennsylvania was knowing, voluntary, and given in exchange for valuable consideration, including his employment with BrightView and his exposure to the Company's valuable customer relationships, goodwill, and trade secrets and other confidential information.

22. Bailey further "authorize[d] and accept[ed] service of process sufficient for personal jurisdiction in any action contemplated by [the] Agreement by registered or certified mail, return receipt requested, postage prepaid, to team member's last known address." Ex. A § 12.

23. In addition, and independent of his contractual consent, Bailey purposefully and knowingly entered into an ongoing contractual and employment relationship with a company headquartered in Blue Bell, Pennsylvania and the Agreement was countersigned by BrightView's Chief Human Resources Officer and administered by BrightView from its Pennsylvania headquarters. Bailey's breaches of the Agreement were expressly aimed at, and have caused injury to, BrightView in Blue Bell, Pennsylvania.

24. Venue is proper in this District by consent and stipulation. As set forth above, in Section 12 of the Agreement Bailey stipulated that the state and federal courts located in or serving Blue Bell, Pennsylvania "shall have . . . venue" over the parties, and expressly "waive[d] any right [he] may have to assert the doctrine of forum non conveniens or similar doctrine or to object to venue with respect to any proceeding brought in accordance with" Section 12.

25. That forum selection clause is valid and enforceable, and under *Atlantic Marine Construction Co. v. U.S. District Court for the Western District of Texas*, 571 U.S. 49 (2013), Bailey's private-interest considerations are deemed to weigh entirely in favor of the selected forum.

26. No extraordinary public-interest factors exist that would defeat enforcement of the parties' bargained-for choice of forum, and any motion to dismiss or transfer on venue or forum non conveniens grounds would be contrary to Bailey's express contractual waiver.

27. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the formation, countersignature, and administration of the Agreement at BrightView's Blue Bell headquarters and the injury sustained by BrightView in this District, where its business records, customer contract administration, customer account manager training and financial operations are centered.

28. The Agreement is governed by Pennsylvania law. Section 12 of the Agreement provides: "This Agreement shall be construed and regulated under and by the laws of the Commonwealth of Pennsylvania, without regard to any conflict of laws provision that would dictate the application of another jurisdiction's laws."

29. Pennsylvania courts, and federal courts sitting in Pennsylvania, honor the intent of contracting parties and enforce the parties' contractual choice-of-law provisions absent an exception.

30. No exception exists in this case as Pennsylvania bears the most substantial and reasonable relationship to the parties and the transaction.

31. For instance, BrightView maintains its headquarters and principal place of business in Blue Bell, Pennsylvania, and the Agreement references BrightView's Pennsylvania headquarters on its face.

32. The Agreement defines protected "Trade Secret(s)" by reference to "the Commonwealth of Pennsylvania Uniform Trade Secrets Act," it references and selects Pennsylvania law as the choice of law, and the Agreement was administered from Pennsylvania. *See* Ex. A at §1.h.

33. Pennsylvania also has a strong interest in the enforcement of restrictive covenant agreements voluntarily entered into with companies headquartered within the Commonwealth.

34. The application of Pennsylvania law is not contrary to any fundamental policy of South Carolina or any other state relevant to Bailey's employment.

## FACTUAL ALLEGATIONS

### A. BrightView's Business and Protectable Interests

35. BrightView is one of the nation's leading providers of commercial landscape services, engaged in "providing landscape and snow and ice services to Customers throughout the United States and abroad, including landscape and sports turf design, construction, maintenance, and enhancement, tree care, water management and irrigation, and snow and ice removal and management" (the "Business"). Ex. A § 1.a.

36. BrightView serves commercial properties, homeowners' associations, and institutional clients throughout the United States, including in the Charleston, South Carolina market.

37. BrightView invests heavily in developing its customer relationships, including by paying its account managers to develop relationships on its behalf and serve as the primary and

often exclusive point of contact between BrightView and its customers. Account managers like Bailey develop trusted relationships with BrightView's most valuable customers and prospects and are granted unfettered access to BrightView's most competitively sensitive materials.

38. BrightView protects its customer goodwill through, among other measures, written restrictive covenant agreements with employees in customer-facing positions.

39. BrightView takes reasonable measures to protect the secrecy and confidentiality of its Confidential Information and Trade Secrets. Those measures include limiting access to customer, pricing, cost, and margin data to employees who have a business need for it; housing that information in a customer relationship management system ("CRM") that requires individual log-in credentials and a password; disclosing pricing and margin information to an account manager only for the accounts that account manager is assigned to manage; requiring employees in customer-facing roles to execute written confidentiality and restrictive covenant agreements as a condition of employment; and reminding departing employees in writing of their continuing confidentiality obligations.

40. BrightView also provides specialized training to its employees through BrightView University, a proprietary training suite not offered to the public. For account managers, this includes specific, proprietary courses that instruct employees on BrightView's individualized approach to customer service and success.

41. For example, Bailey enrolled and participated in specific business focused instruction such as "Book of Business Breakdown," "Customer Needs Alignment," "Purchase Order Process," and the "Customer Obsession Playbook.".

42. Bailey received an "Account Manager Learning Path: Customer Playbook with Instructor Led Training" certificate as a result of his specialized training.

### B. Bailey's Employment and the Agreement

43. BrightView hired Bailey on or about July 15, 2024 as an Account Manager based in its Charleston, South Carolina branch, servicing a territory encompassing Charleston, West Ashley, Hollywood, North Charleston, Johns Island, James Island, Sullivans Island, Isle of Palms, Summerville, and Mount Pleasant, South Carolina.

44. In this role, Bailey was paid around $82,000 inclusive of base salary and performance bonus.

45. Prior to beginning employment and as a condition of his hire, Bailey electronically executed the Agreement on or about July 2, 2024, and the Agreement was made and entered into as of July 15, 2024, the first day of Bailey's employment. *See* Ex. A at 1;7.

46. The Agreement was countersigned on behalf of BrightView by Amanda Orders, BrightView's Chief Human Resources Officer. The Agreement recites, and Bailey acknowledged, that it was supported by consideration including "BrightView's initial or continued employment of team member, BrightView's promise to disclose to team member Confidential and Trade Secret Information and provide specialized training . . . and the mutual benefits conferred herein." Ex. A at 1.

47. BrightView Landscapes, LLC is the BrightView entity that is a party to the Agreement, that employed Bailey, and that holds the right to enforce the Agreement against him.

48. In Section 5 of the Agreement, entitled "Non-Competition," Bailey agreed as follows:

> Team member agrees that during team member's employment and for a period of one (1) year following the voluntary or involuntary termination of team member's employment for any reason and with or without cause, team member will not, directly or Indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Restricted Territory where doing so will require

> team member to provide the same or substantially similar services to a Competing Business as those that team member provided to BrightView during the Look Back Period [of] [sic] such other services that would result in the use or disclosure of Confidential Information.

49. The Agreement defines "Competing Business" as:

> any individual (including team member), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise that is the same as, or substantially the same as, any part of the Business of BrightView, or that is taking material steps to engage in such Business.

Ex. A § 1.b.

50. The Agreement defines the "Restricted Territory" as "the geographic territory in which team member worked, represented BrightView, or had Material Business Contact with BrightView's Customers in the Look Back Period." Ex. A § 1.g.

51. In Section 6 of the Agreement, entitled "Non-Solicitation of Customers," Bailey agreed as follows:

> Team member agrees that during team member's employment and for a period of two (2) years following the voluntary or involuntary termination of team member's employment for any reason and with or without cause, team member will not, either on behalf of team member or for any Competing Business, directly or Indirectly solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate any Customer or accept any business from any Customer with whom team member had Material Business Contact in the Look Back Period, for the purposes of providing services that are the same as or substantially similar to those provided in the Business of BrightView.

52. The Agreement defines "Customers" as

> those individuals, companies, or other entities for whom BrightView has provided or does provide products or services in connection with the Business of BrightView or to whom BrightView has provided written proposals concerning the Business of BrightView and as to which team member has had Material Business Contact or received Confidential Information

during the Look Back Period. Ex. A § 1.d.

53. The Agreement defines "Material Business Contact" as "contact that is intended to establish or strengthen a business or professional relationship for BrightView, regardless of whether the contact is with a Customer directly assigned to team member or a Customer with which team member otherwise has contact in furtherance of the team member's job duties." Ex. A § 1.f.

54. The Agreement defines the "Look Back Period" as the two (2) year period preceding the termination of team member's employment. Ex. A § 1.d.

55. Bailey's entire tenure with BrightView, from July 15, 2024 through March 10, 2026, falls within the Look Back Period.

56. Under the Agreement, "Indirectly" means "that team member will not assist others in performing or direct or control others to perform those activities team member is prohibited from engaging in directly pursuant to the terms of this Agreement." Ex. A § 1.e.

57. In Section 9 of the Agreement, Bailey agreed "that the restrictive time periods in this Agreement shall be tolled (i.e., suspended) during any period of time in which team member is violating these provisions."

58. In Section 13 of the Agreement, entitled "Relief, Remedies, and Enforcement," Bailey acknowledged that

> the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect BrightView's legitimate business interests, including Company goodwill and Customer and other business relationships, Confidential Information and Trade Secrets, and the specialized skills and knowledge gained by team member, . . . [and] that a breach of any provision of this Agreement by the team member will cause serious and irreparable injury to BrightView that will be difficult to quantify and which may not be adequately compensated by monetary damages alone.

59. Bailey further agreed that in the event of a breach or threatened breach,

> BrightView shall be entitled to injunctive relief, both temporary and final,[ as well as] any and all other legal or equitable remedies available to it . . . including the disgorgement of any profits, commissions, or fees realized by team member, any subsequent employers, any business owned or operated by team member, or any of team member's agents, heirs, or assigns, as well as all costs and attorneys' fees incurred because of team member's breach of any provisions of this Agreement.

Exhibit A § 13.

60. Bailey also agreed in Section 13 "that the knowledge, skills, and abilities he or she possesses at the time of commencement of employment are sufficient to permit team member to earn a livelihood satisfactory to team member without violating any provision of Sections 3 through 8" of the Agreement, and in Section 10 agreed "to provide a copy of this Agreement to any subsequent employer . . . to which team member intends to provide services that may conflict with any of team member's obligations in this Agreement prior to engaging in any such activities."

61. The restrictive covenants in the Agreement are ancillary to Bailey's employment relationship with BrightView, are reasonably necessary to protect BrightView's legitimate business interests — including its customer relationships and goodwill, its Confidential Information and Trade Secrets, and its investment in the specialized training of its workforce — and are reasonably limited in duration, geographic reach, and scope of restricted activity, as described herein.

62. The covenants were supported by adequate consideration, having been executed ancillary to, and as a condition of, the commencement of Bailey's employment.

63. Bailey managed multiple accounts for BrightView up until his voluntary resignation, accounting for approximately $1.7 million in annual revenue, a material book of business to BrightView.

64. Bailey also received specialized and confidential information regarding these accounts that was not public, including data about customer contact information, pricing, communications, pricing strategies and discounts.

65. Bailey also received access to BrightView's CRM, which was password and log-in protected, which contained all of BrightView's information about its customers.

66. Bailey would not have had access to this confidential information or training but for his employment with BrightView.

67. Bailey served as the primary interface between BrightView and the customers he was assigned to manage.

68. BrightView supported Bailey heavily in his customer development role by providing him with prospective customer leads, prospect management tools, a vehicle, and equipment.

69. An essential function of Bailey's role was that he would have direct and material business contact with representatives of the accounts that he was assigned to manage.

70. As is typical in a sales environment, Bailey's assigned territory was not permanently fixed at the outset of his employment and changed over the course of it as it grew or was modified to meet the business' needs. The geographic territory where he served customers is nonetheless discrete and easily discernible. From 2024-2026, Bailey served BrightView customers in its Charleston metropolitan market, consisting of Charleston, West Ashley, Hollywood, North Charleston, Johns Island, James Island, Sullivans Island, Isle of Palms, Summerville, and Mount Pleasant, South Carolina. ("Restricted Territory").

71. The Restricted Territory is the geographic territory in which Bailey worked, represented BrightView, and had Material Business Contact with BrightView's Customers during

the Look Back Period. The Restricted Territory is defined in Section 1.g of the Agreement, and the Restricted Territory does not extend beyond the market Bailey actually serviced.

72. Oyster Point is located in Mount Pleasant, South Carolina, within the Restricted Territory. Stono Ferry is located in Hollywood, South Carolina, within the Restricted Territory. The Charleston branch that Bailey now manages for Bridgewater operates within and directs competitive activity towards the Restricted Territory.

**C. Bailey's Resignation and Employment with a Direct Competitor**

73. Throughout his employment, and by virtue of his position as Account Manager, BrightView disclosed to Bailey, and Bailey had access to and acquired, BrightView's Confidential Information, including customer contacts and preferences, service specifications, the terms and expiration dates of customer contracts, and BrightView's payment, pricing, and margin information for the accounts within his book of business.

74. On or about February 28, 2026, Bailey voluntarily resigned from BrightView by informing his then-manager, Damien McDonagh, that he was leaving to go to Bridgewater. Bailey did not provide further details about the role he would perform there, despite to the company's efforts to obtain such details.

75. While Bridgewater is a competitor, the Agreement does not prohibit him outright from working there. Instead, it prohibits him from performing the same or similar account management function as he had performed at BrightView in the Restricted Territory.

76. Though BrightView was aware that Bailey was leaving for a competitor, it did not have information as of Bailey's departure that he was going to breach his obligations.

77. On March 3, 2026, shortly after he provided his notice, BrightView emailed Bailey reminding him of his continuing legal obligations under the Agreement and enclosing a copy. Exhibit B (reminder letter).

78. Bailey became upset after receiving the notice and stopped cooperating with BrightView, by refusing to perform his remaining job duties, refusing to answer questions and cooperate with employees who needed his assistance transitioning his duties, and even refusing to return his company-issued vehicle.

79. When he eventually returned the vehicle, it was in poor condition and filled with trash and other refuse.

80. BrightView formally separated him from employment on March 10, 2026.

81. Bailey did not, at or after his separation, return to BrightView, or certify the destruction of, all BrightView documents, data, and Confidential Information in his possession, custody, or control. Ex. A § 4.

**D. BrightView Learns of Bailey's Breach of the Agreement Through the Diversion of BrightView's Oyster Point Accounts**

82. At the time of his resignation, BrightView did not have reason to believe Bailey would target his former BrightView customers or compete in the Restricted Territory merely because he was going to a smaller landscaping company in South Carolina.

83. At BrightView, Bailey's book of business included four related commercial accounts at the Oyster Point community ("Oyster Point").

84. Oyster Point is a residential community of 540 residences located in Mount Pleasant, South Carolina (a suburb of Charleston, South Carolina and located within the Restricted Territory).

85. BrightView had provided excellent service to Oyster Point for six years, since 2020, having developed the relationship without Bailey and prior to his employment at BrightView.

86. Oyster Point was the source of four (4) high value commercial accounts for BrightView, each of which involved separate contracts between BrightView and Oyster Point. (collectively, the "Oyster Point Accounts").

87. The Oyster Point Accounts collectively represented approximately <u>$293,898</u> in annual contract value to BrightView.

88. Bailey was designated as BrightView's Account Manager for each of the Oyster Point Accounts. Each of the Oyster Point Accounts is a "Customer" as defined in Section 1.d of the Agreement, and Bailey had Material Business Contact with each of the Oyster Point Accounts during the Look Back Period. Bailey was the face of BrightView to all of the customers with whom he had Material Business Contact during his employment, and he received or was given access to Confidential Information concerning each account, including BrightView's pricing, margins, service specifications, and contract terms and expiration dates.

89. Indeed, though BrightView provided Bailey with access and support to Oyster Point, he was responsible for maintaining the Oyster Point Accounts on BrightView's behalf.

90. Bailey decided to use this inside access to convert Oyster Point for his and Bridgewater's benefit.

91. On March 31, 2026, three weeks after Bailey's separation and approximately four weeks after he gave notice of his resignation, Oyster Point suddenly approached BrightView with a substantial list of performance complaints and gave BrightView sixty days' notice to cure the defects.

92. Oyster Point is governed by a homeowners association. A decision by Oyster Point to compile a substantial list of claimed performance defects and to issue a formal sixty-day notice to cure would have required deliberation, preparation, and internal approval over a period of time preceding its delivery to BrightView.

93. Upon information and belief, that deliberation and preparation began while Bailey was still employed by BrightView and assigned as the Account Manager for the Oyster Point Accounts, and Bailey facilitated the preparation of the detailed list of claimed performance defects in the sixty-day notice to cure for Oyster Point to deliver to BrightView.

94. BrightView had received no material complaints about the performance of its services to Oyster Point at any time from 2020 through February 28, 2026, the date Bailey gave notice of his resignation, or at any time thereafter until Oyster Point delivered its list of claimed performance defects and its sixty-day notice to cure on March 31, 2026.

95. Nor did BrightView receive, at any time prior to Bailey's notice of resignation, any indication that Oyster Point was contemplating terminating the Oyster Point Accounts.

96. BrightView expended significant effort to cure the alleged service defects promptly.

97. This was despite the fact that Bailey had stopped responding to BrightView and failed to complete a number of transition tasks that set back BrightView's efforts to restore Oyster Point's confidence.

98. Because of BrightView's extended efforts, representatives of Oyster Point indicated that they felt the actions taken by BrightView were sufficient to remediate the issues and repair the relationship.

99. Yet Oyster Point still terminated early all four of the Oyster Point Accounts on May 1, 2026, effective May 31, 2026, and without any further warning. Oyster Point gave that notice of termination approximately one month prior to the day that the sixty-day cure period was set to expire. The Oyster Point contracts were largely set to renew in December 2026, and at the time of termination, had seven months of service still to go.

100. Upon information and belief, Bailey began soliciting Oyster Point for his own and Bridgewater's benefit before he resigned from BrightView, and advised Oyster Point on how to terminate the Oyster Point Accounts without disclosing his involvement.

101. That belief is based on the following facts and the reasonable inferences drawn therefrom: Bailey was the BrightView Account Manager assigned to the Oyster Point Accounts and was the face of BrightView to that customer; Oyster Point delivered a substantial list of performance defects and a sixty-day notice to cure on March 31, 2026, three weeks after Bailey's separation, after six years without any material complaint; Bailey stopped responding to BrightView and left tasks undone during the cure period, which set back BrightView's efforts to restore Oyster Point's confidence; Oyster Point's own representatives confirmed that BrightView's efforts were sufficient to remediate the issues raised in March, and Oyster Point nevertheless terminated all four of the Oyster Point Accounts on May 1, 2026, approximately one month before the sixty-day cure period was set to expire; Bridgewater had no prior relationship with Oyster Point; and Bailey took over the Oyster Point Accounts on Bridgewater's behalf in *the same week* the termination took effect.

102. In late May 2026, BrightView employees learned through Mr. Shelton Culpepper, a subcontractor to Oyster Point, that Bailey had directly taken over the Oyster Point Accounts on behalf of Bridgewater.

103. During the week of May 25–31, 2026, a subcontractor observed Bridgewater personnel performing landscape services at the Oyster Point service areas and reported that observation to BrightView personnel by text message.

104. Mr. Culpepper also informed members of BrightView's team that Bailey had contacted him directly and had directed him to perform services for Bridgewater at Oyster Point during the week of May 25–31, 2026.

105. Oyster Point's termination of BrightView's services was effective May 31, 2026.

106. Bridgewater is owned by Michael Knabenshue ("Knabenshue"), who formerly owned a company that was purchased by BrightView. Although Bridgewater was originally established as a land development business, it since has expanded into commercial landscape maintenance and now competes directly with BrightView for commercial landscape maintenance business in South Carolina.[2]

107. Bridgewater is a "Competing Business" as defined in Section 1.b of the Agreement.

108. Bailey serves as Bridgewater's Branch Manager for Charleston,[3] a role in which he is responsible for building out and managing Bridgewater's competing commercial landscape business in the very territory he serviced for BrightView, performing services that are the same as or substantially similar to the account management and client relationship services he provided to BrightView during the Look Back Period, and in which his duties would inevitably require the use or disclosure of BrightView's Confidential Information.

109. As an Account Manager for BrightView, Bailey's duties were to manage and retain the customer relationships within his assigned book of business, to serve as the primary and often

[2] *See* Bridgewater Land Group's landscape management services offerings at https://www.bridgewaterlandgroup.com/landscapemaintenance (last visited July 27, 2026).

[3] *See* Bridgewater Land Group's executives page, at https://www.bridgewaterlandgroup.com/team (last visited July 27, 2026).

exclusive point of contact for those customers, to oversee the delivery and quality of landscape maintenance services at those customers' properties, to identify, price, and propose additional work and enhancements, and to secure the renewal of customer contracts.

110. Upon information and belief, and based on the nature of the branch manager role in the commercial landscape maintenance industry and upon learning that Bailey has personally assumed responsibility for the Oyster Point Accounts, Bailey's duties as Bridgewater's Charleston Branch Manager include soliciting and acquiring commercial landscape maintenance customers in the Charleston metropolitan market, pricing and bidding that work, managing customer relationships and contracts, and overseeing the delivery of landscape maintenance services at customer properties.

111. Bailey is personally servicing the Oyster Point Accounts on Bridgewater's behalf, which is the same function he performed as to those same four accounts on BrightView's behalf.

112. The services Bailey provides to Bridgewater are therefore the same as, or substantially similar to, the services he provided to BrightView during the Look Back Period, and they are directed at the same customers, in the same market, in the same industry..

113. Bailey's employment with Bridgewater as Charleston Branch Manager falls squarely within the activities, territory, and time period restricted by Section 5 of the Agreement.

114. Bailey is employed by and participating in a Competing Business, within the Restricted Territory, during the one-year restricted period, in a role requiring the same or substantially similar services he provided to BrightView.

115. Section 10 of the Agreement required Bailey to provide a copy of the Agreement to any subsequent employer to which he intended to provide services that may conflict with his obligations, before engaging in any such activities. Ex. A § 10.

116. Upon information and belief, Bailey did not provide a copy of the Agreement to Bridgewater before beginning work there. That belief is based on Bailey's failure to disclose the role he would perform for Bridgewater, his adverse reaction to being reminded in writing of his obligations, his refusal to assist in transitioning his accounts, and Bridgewater's willingness to install him as Branch Manager in his restricted territory and to accept the diverted Oyster Point Accounts.

117. Upon information and belief, based on Bailey's role as the BrightView Account Manager responsible for the Oyster Point Accounts, his position as Bridgewater's Branch Manager for the Mount Pleasant territory in which the Oyster Point Accounts are located, the close temporal proximity between Bailey's move to Bridgewater and Oyster Point's termination of the Oyster Point Accounts, and the fact that Bridgewater had not previously serviced the Oyster Point Accounts, Bailey directly or indirectly solicited, diverted, or appropriated the Oyster Point Accounts, or participated in Bridgewater's solicitation of the Oyster Point Accounts, in violation of Section 6 of the Agreement.

118. Upon information and belief, before Bailey joined Bridgewater, Bridgewater had never provided landscape maintenance services to Oyster Point, had no relationship with Oyster Point's board or property management company, and had not submitted any proposal to Oyster Point.

119. Bailey's conversion of Oyster Point has deprived it of revenue that was renewable and expected to continue after December 2026.

120. Because the revenue generated from the Oyster Point Accounts was recurring, the loss of this revenue stream will compound as time goes on.

121. The Oyster Point Accounts were not the end of Bailey's targeting of BrightView accounts that he formerly serviced.

122. On July 1, 2026, BrightView was informed by another customer, the Stono Ferry Homeowners Association ("Stono Ferry"), located in Hollywood, South Carolina, that it would be terminating its account with BrightView within 30 days.

123. The termination of the Stono Ferry account will deprive BrightView of another recurring revenue stream within the Restricted Territory.

124. Like Oyster Point, BrightView received no material complaint from Stono Ferry prior to Bailey's departure.

125. Bailey had relationships that he developed with Stono Ferry representatives solely due to his employment with BrightView.

126. In the course of his employment with BrightView, Bailey had direct dealings with the Stono Ferry account and material business contact with Stono Ferry's representatives in furtherance of his job duties for BrightView.

127. Stono Ferry is a "Customer" as that term is defined in Section 1.d of the Agreement, and Bailey had Material Business Contact with Stono Ferry during the Look Back Period within the meaning of Section 1.f of the Agreement.

128. Bailey had access to BrightView's Confidential Information concerning the Stono Ferry account, including BrightView's pricing, costs and margins, service specifications, and the terms and renewal date of BrightView's contract with Stono Ferry.

129. The full extent of the monetary loss to BrightView from the termination of the Stono Ferry account is not presently known and cannot be quantified at this time. That loss will

depend in part on facts within the knowledge of Bailey and Bridgewater, including whether and on what terms they assume the account.

130. The last day of service to Stono Ferry is July 30, 2026. BrightView is investigating, but expects that Bailey and Bridgewater will be taking over service for Stono Ferry.

**E. Harm to BrightView**

131. As a direct and proximate result of Bailey's conduct, BrightView has lost the Oyster Point Accounts and the revenue, profits, and goodwill associated with them, and faces the imminent threat of further loss of customers, and goodwill within Bailey's former territory.

132. BrightView has incurred pecuniary harm of at least $293,898 in lost annual contract value for fiscal year 2026. Because that revenue was recurring, BrightView would have received comparable value in each following year that the Oyster Point Accounts remained with BrightView.

133. That figure is only one measure of the harm BrightView has suffered. BrightView's continuing damages are presently unknown and cannot presently be quantified. Bailey's ongoing employment with Bridgewater in violation of the Agreement, and his continuing ability to exploit BrightView's customer relationships and his specialized training, threaten to erode BrightView's customer goodwill, market position, and other intangible irreparable harm for which monetary damages alone are inadequate.

134. Bailey himself acknowledged and stipulated to this kind of irreparable harm in Section 13 of the Agreement, in which he agreed that "a breach of any provision of this Agreement . . . will cause serious and irreparable injury to BrightView that will be difficult to quantify and which may not be adequately compensated by monetary damages alone," and that BrightView "shall be entitled to injunctive relief, both temporary and final."

135. BrightView has suffered immediate and irreparable losses because Bailey is working in the same territory that he served BrightView, using BrightView's his specialized training to target BrightView's customers, and unfairly competing due to his intimate knowledge of BrightView's service offerings and their strengths and weaknesses.

136. As demonstrated with Oyster Point, Bailey's actions have caused BrightView to lose customer goodwill, where Bailey both delayed remediating Oyster Point's issues and likely coached it to terminate the Oyster Point Accounts.

137. On information and belief, Bailey is soliciting BrightView's other customers in the Restricted Territory that he is only familiar with due to his employment by BrightView.

138. Bailey's work for Bridgewater has undercut and eroded BrightView's market position vis-à-vis other BrightView customers in the Restricted Territory, as evidenced by the loss of Oyster Point and likely, Stono Ferry.

139. In short, Bailey's continued work for Bridgewater in the Restricted Territory, his use of his specialized training to undercut BrightView, and his ongoing efforts to take his former employer's customers are an unrestrained continuation of his violation of the Agreement, and the resulting harms are causing incalculable damage to BrightView's business.

## COUNT I

### Breach of Contract — Non-Competition (Agreement § 5)

140. BrightView incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

141. The Agreement is a valid and enforceable contract between BrightView and Bailey.

142. The Agreement is supported by adequate consideration, including Bailey's hire and employment by BrightView, BrightView's disclosure of its Confidential Information and Trade Secrets to Bailey, and the specialized training BrightView provided to Bailey.

143. The non-competition covenant in Section 5 of the Agreement is ancillary to Bailey's employment relationship with BrightView and is reasonably necessary to protect BrightView's legitimate business interests (including its customer goodwill, its Confidential Information and Trade Secrets, and its investment in specialized training).

144. The non-competition covenant in Section 5 of the Agreement is reasonably limited in duration (one year), geography (the Restricted Territory in which Bailey worked) and scope (the same or substantially similar services Bailey provided to BrightView), as Bailey himself acknowledged in Section 13 of the Agreement.

145. BrightView has performed all of its obligations under the Agreement.

146. Bailey has materially breached, and continues to breach, Section 5 of the Agreement by working for Bridgewater in the Restricted Territory during the one-year restricted period in a role requiring him to provide the same or substantially similar services as those he provided to BrightView during the Look Back Period

147. This role will result and/or has resulted in the solicitation BrightView's customers in further violation of the Agreement.

148. Bailey has been in continuous violation of Section 5 of the Agreement since at least May 2026, and as far back as March 2026. Under Section 9 of the Agreement, the one-year restricted period shall be tolled throughout the period of Bailey's violation.

149. BrightView bargained and paid for a one-year period during which Bailey would not compete against it in the Restricted Territory, and it furnished the consideration for that

promise in the form of employment, compensation, specialized training through BrightView University, customer leads, prospect management tools, equipment, and access to its Confidential Information and Trade Secrets. BrightView has not received the benefit of that bargain.

150. As a direct and proximate result of Bailey's breach, BrightView has suffered and will continue to suffer damages, including lost revenue, lost profits, and lost customer goodwill, in an amount to be proven at trial, together with attorneys' fees and costs as specifically provided for in Section 13 of the Agreement, and irreparable harm for which BrightView has no adequate remedy at law.

## COUNT II

### Breach of Contract — Non-Solicitation of Customers (Agreement § 6)

151. BrightView incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

152. The Agreement is a valid and enforceable contract between BrightView and Bailey, supported by adequate consideration as alleged above.

153. The customer non-solicitation covenant in Section 6 of the Agreement is ancillary to Bailey's employment relationship with BrightView, having been executed before and as a condition of the commencement of that employment.

154. The customer non-solicitation covenant in Section 6 of the Agreement is reasonably necessary to protect BrightView's legitimate business interests in its customer relationships and goodwill, and is reasonably limited in duration (two years) and scope, restricting Bailey only as to Customers with whom he had Material Business Contact during the two-year Look Back Period, and only for the purpose of providing services that are the same as or substantially similar to those provided in the Business of BrightView.

155. BrightView has performed all of its obligations under the Agreement.

156. Bailey has materially breached, and continues to breach, Section 6 of the Agreement by, directly or Indirectly, soliciting, diverting, or appropriating and/or accepting business from BrightView customers, including the Oyster Point Accounts, each of which is a Customer with whom Bailey had Material Business Contact during the Look Back Period, on behalf of Bridgewater, a Competing Business, during the two-year restricted period, for the purpose of providing services that are the same as or substantially similar to those provided in the Business of BrightView.

157. Bailey is continuing to breach Section 6 of the Agreement by directly or Indirectly soliciting, diverting, or appropriating and/or accepting business from a currently unknown number of BrightView customers, a fact easily confirmed through discovery.

158. On information and belief, Bailey initiated contact with Oyster Point on behalf of Bridgewater with the intent of pirating the Oyster Point Accounts away from BrightView.

159. On information and belief, Bailey initiated contact with Stono Ferry on behalf of Bridgewater with the intent of pirating Stono Ferry's business away from BrightView.

160. In the alternative, even if Bailey was not the initiating party, he knowingly continued the commercial transaction and facilitated Oyster Point's business, even though it was prohibited by Section 6, on behalf of Bridgewater.

161. Therefore, Section 6 is breached by Bailey's acceptance of the Oyster Point Accounts' business on Bridgewater's behalf regardless of which party initiated the contact, because Bailey expressly agreed that he would not "accept any business from any Customer with whom team member had Material Business Contact in the Look Back Period."

162. Bailey has also breached, and threatens to continue breaching, Section 6 of the Agreement as to Stono Ferry, a Customer with whom he had Material Business Contact during the Look Back Period, by soliciting, diverting, or appropriating that account, or by accepting or preparing to accept its business on Bridgewater's behalf.

163. Bailey has been in continuous violation of Section 6 of the Agreement since on or about March 2026. Under Section 9 of the Agreement, the two-year restricted period has been tolled throughout that period of violation and remains tolled.

164. As a direct and proximate result of Bailey's breach, BrightView has lost the Oyster Point Accounts, representing at least $293,898 in annual contract value, and has suffered and will continue to suffer damages, including lost revenue, lost profits, and lost customer goodwill, in an amount to be proven at trial, together with attorneys' fees and costs as specifically provided for in Section 13 of the Agreement, and irreparable harm for which BrightView has no adequate remedy at law.

## COUNT III

### Breach of the Duty of Loyalty

165. BrightView incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

166. At all times during his employment, Bailey was an employee and agent of BrightView. BrightView entrusted him with the management of the customer relationships within his assigned book of business and with authority to act on BrightView's behalf in dealing with those customers. Bailey exercised discretion on BrightView's behalf in servicing those relationships, in identifying, pricing, and proposing additional work, and in seeking the renewal of customer contracts.

167. Under Pennsylvania law, an employee owes his employer a duty of loyalty throughout the employment relationship. That duty requires the employee to act solely for the benefit of the employer in all matters within the scope of his employment, to refrain from competing with the employer or acting for the benefit of a competitor during employment, and to disclose to the employer information material to the employer's interests that comes to the employee in the course of his work.

168. That duty arises from the employment and agency relationship as a matter of law and exists independent of the Agreement. The conduct alleged in this Count concerns Bailey's performance and non-performance of his duties while he was employed by and being compensated by BrightView.

169. This Count is not based upon the use, disclosure, or misappropriation of any trade secret. It is based upon Bailey's disloyal conduct during his employment, and it would exist on the facts alleged even if BrightView possessed no trade secret and even if Bailey had signed no Agreement.

170. BrightView compensated Bailey from the commencement of his employment through the effective date of his separation, and Bailey accepted that compensation.

171. Among the duties Bailey owed BrightView was the duty to disclose to BrightView information material to BrightView's interests that came to him in the course of his work as its Account Manager. Oyster Point's dissatisfaction and its intention to terminate the Oyster Point Accounts were each material to BrightView's interests and known to Bailey.

172. Bailey breached his duty of loyalty to BrightView while he was still employed by BrightView by, among other things: (a) upon information and belief, soliciting Oyster Point on behalf of himself and Bridgewater before he resigned; (b) upon information and belief, advising

Oyster Point on how to terminate the Oyster Point Accounts and how to do so without revealing his involvement; (c) upon information and belief, participating in and assisting, while he was still employed by BrightView, the deliberation and preparation of the list of claimed performance defects and the sixty-day notice to cure that Oyster Point delivered to BrightView on March 31, 2026; (d) withholding his services during the remainder of his employment, by ceasing to perform his job duties, refusing to respond to or assist the BrightView employees who were transitioning his accounts, and leaving required work on the Oyster Point Accounts undone, which set back BrightView's subsequent effort to cure the defects Oyster Point identified and to preserve that relationship.

173. Bailey's conduct exceeded the preparations to compete that a departing employee is permitted to make. He did not merely arrange for future employment. He acted against BrightView's interests, and for the benefit of a competitor, during a period in which BrightView was paying him to advance BrightView's interests.

174. As a direct and proximate result of Bailey's breach of his duty of loyalty, BrightView incurred the cost of a remediation effort that Bailey had undermined from within, incurred the cost of transitioning the accounts Bailey refused to transition, and lost the goodwill associated with the customer relationships Bailey was paid to maintain.

175. Bailey's solicitation of Oyster Point before his resignation, and his participation in the preparation of the claimed performance defects and the sixty-day notice to cure, were each a proximate cause of BrightView's subsequent loss of the Oyster Point Accounts and the approximately $293,898 in annual contract value they represented.

176. Bailey's breach of his duty of loyalty was knowing, intentional, and undertaken for his own financial benefit and that of a competitor, in conscious disregard of BrightView's rights.

Bailey acted against BrightView's interests while BrightView was paying him to advance them, concealed his solicitation of Oyster Point, withheld from BrightView the customer's intention to terminate, and continued to accept BrightView's compensation throughout. BrightView is therefore entitled to punitive damages.

## COUNT IV

### Tortious Interference with Existing Contractual Relations

177. BrightView incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein. BrightView does not incorporate into this Count, and does not base this Count upon, any allegation that Bailey used, disclosed, or misappropriated any trade secret.

178. BrightView and Oyster Point were parties to several contracts, defined above as the Oyster Point Accounts. Oyster Point is the contracting counterparty on each of the four Oyster Point Accounts. Under those contracts, BrightView provided commercial landscape maintenance and irrigation services to the Oyster Point community for approximately $293,898 in annual contract value.

179. Each of the Oyster Point Accounts was in force and was being performed by BrightView as of February 28, 2026, the date Bailey gave notice of his resignation. BrightView had performed those contracts continuously since 2020. At no time from 2020 through February 28, 2026 did Oyster Point give BrightView notice of any material performance complaint or any indication that it was contemplating terminating the Oyster Point Accounts.

180. BrightView and Stono Ferry were, and as of the filing of this Verified Complaint remain parties to an existing contract under which BrightView provides commercial landscape maintenance services to Stono Ferry. That contract was in force and was being performed by

BrightView, without material complaint, at all times through Stono Ferry's July 1, 2026 notice of termination.

181. Bailey knew of each of these contractual relationships. He served as BrightView's Account Manager for each of the four Oyster Point Accounts and worked with Stono Ferry account for BrightView in the past, he administered the Oyster Point Accounts on BrightView's behalf, and he possessed BrightView's contract terms, renewal dates, pricing, and margins for each.

182. Bailey's employment with BrightView ended in March 2026. At all times relevant to the acts alleged in this Count, Bailey was not an employee or agent of BrightView, had no authority to act on BrightView's behalf, and was acting for himself and for Bridgewater, a Competing Business and a stranger to BrightView's contracts with Oyster Point and Stono Ferry.

183. Following the end of his employment with BrightView, Bailey purposefully acted to harm BrightView's contractual relationship with Oyster Point. Upon information and belief, and based on the facts alleged herein, Bailey solicited Oyster Point to terminate the Oyster Point Accounts, advised Oyster Point on how to accomplish that termination without disclosing his involvement, and then accepted and assumed the Oyster Point Accounts on Bridgewater's behalf in the same week the termination took effect.

184. BrightView cured the performance defects Oyster Point had identified, and representatives of Oyster Point advised BrightView that the actions BrightView had taken were sufficient to remediate the issues raised in March. Oyster Point nevertheless terminated all four of the Oyster Point Accounts on May 1, 2026, approximately one month before the sixty-day cure period was set to expire and without any further warning, and Bailey took over those same four accounts for Bridgewater in the same week the termination took effect. Upon information and

belief, the performance grounds Oyster Point stated were not the operative cause of the termination, and the termination was caused by Bailey's solicitation.

185. Bailey's conduct before his separation, including his solicitation of Oyster Point while he was still employed by BrightView and his participation in the preparation of the claimed performance defects and the sixty-day notice to cure, is alleged in this Count as evidence of his knowledge, his intent, and the absence of any justification for the acts alleged above, and is separately actionable as alleged in Count IV.

186. Bailey knew of BrightView's contract with Stono Ferry, had Material Business Contact with Stono Ferry during the Look Back Period, and possessed BrightView's pricing, costs and margins, service specifications, and contract terms and renewal date for that account. On July 1, 2026, without any prior material complaint, Stono Ferry gave notice that it would terminate its contract with BrightView effective July 30, 2026, in the same pattern, within the same territory, and within months of the diversion of the Oyster Point Accounts. Bailey is presently positioned to divert the Stono Ferry account to Bridgewater, and absent injunctive relief BrightView will lose that contractual relationship as it lost the Oyster Point Accounts.

187. Bailey acted with the specific intent of causing Oyster Point to terminate the Oyster Point Accounts and of transferring that business to Bridgewater, and he threatens to act with the same intent as to Stono Ferry and to other BrightView Customers within the Restricted Territory.

188. Bailey's conduct was neither privileged nor justified. A competitor's ordinary privilege to compete for business does not extend to conduct undertaken through wrongful means, including the breach of the duty of loyalty an employee owes his employer, the breach of enforceable restrictive covenants, deception, and the concealment of material facts from the party whose contractual relationship is disrupted. Bailey set the termination of the Oyster Point Accounts

in motion while he was employed by BrightView, while he owed BrightView a duty of loyalty, and while BrightView continued to compensate him to advance its interests. He concealed his involvement in that conduct from BrightView, he advised Oyster Point how to accomplish the termination without disclosing his involvement, and he withheld from BrightView Oyster Point's intention to terminate.

189. That Bailey acted in part to advance his own economic interest and that of his new employer does not privilege his conduct, because he acted with the purpose of injuring BrightView and of taking for Bridgewater the customer relationships that BrightView had built and had paid Bailey to maintain.

190. In the alternative, and to the extent any contract identified in this Count is determined to have been terminable at will, Bailey accomplished his interference through means that are independently actionable apart from this Count, including his breach of the duty of loyalty alleged in Count IV, his breach of Section 3 of the Agreement alleged in Count III, and his breaches of Sections 5 and 6 of the Agreement alleged in Counts I and II.

191. The duty not to interfere with BrightView's contracts with third parties is a duty imposed by law and owed to BrightView independent of any agreement between BrightView and Bailey.

192. As a direct and proximate result of Bailey's interference, BrightView has suffered actual legal damage, including the loss of the four Oyster Point Accounts and the approximately $293,898 in annual contract value they represented, the loss of the recurring revenue those contracts would have generated in subsequent years, the loss of customer goodwill, and the costs it incurred in attempting to preserve the Oyster Point relationship. BrightView faces the further

imminent loss of the Stono Ferry contract and of additional customer relationships within the Restricted Territory.

193. Bailey's interference was intentional, willful, and undertaken in conscious disregard of BrightView's contractual rights. Bailey targeted the very customer relationships he had been entrusted to manage, used the access and information BrightView had given him in order to do so, concealed his involvement from BrightView, and advised the customer how to conceal it as well. BrightView is therefore entitled to punitive damages.

## NO TRIAL BY JURY

A trial by jury is not requested by Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff BrightView Landscapes, LLC respectfully requests that this Court enter judgment in its favor and against Defendant Henry Bailey, and award the following relief:

(a) Entry of a temporary restraining order in the proposed form attached hereto and a preliminary and permanent injunction following a substantially similar form;

(b) An order, pursuant to Section 9 of the Agreement, tolling and extending the restricted periods in the Agreement for a period equal to the duration of Bailey's violations;

(c) Compensatory damages in an amount to be determined at trial, in excess of $75,000, exclusive of interest and costs;

(d) Forfeiture and disgorgement of all compensation paid by BrightView to Bailey during the period of his disloyalty;

(e) Punitive damages on Counts III and IV in an amount to be determined at trial;

(f) Disgorgement, pursuant to Section 13 of the Agreement, of any profits, commissions, or fees realized by Bailey from Bridgewater as a result of Bailey's breaches of the Agreement;

(g) Pre-judgment and post-judgment interest as permitted by law;

(h) BrightView's costs and reasonable attorneys' fees incurred because of Bailey's breaches, as provided in Section 13 of the Agreement; and

(i) Such other and further relief as the Court deems just and proper.

**VERIFICATION**

I, Katrina Albertson, declare as follows:

1. I am an HR Director of BrightView Landscapes, LLC ("BrightView"), the Plaintiff in the above-captioned action. I am duly authorized to execute this Verification on BrightView's behalf.

2. The averments set forth in the foregoing Verified Complaint are based upon my own personal knowledge, upon my review of BrightView's books, records, and files maintained in the ordinary course of its business, and upon information furnished to me by BrightView employees and representatives acting within the scope of their duties.

3. I have read the foregoing Verified Complaint. Except as to those averments expressly made upon information and belief, the factual averments contained therein are true and correct of my own personal knowledge. As to those averments made upon information and belief, I believe them to be true.

4. Attached to the Verified Complaint as **Exhibit A** is a true and correct copy of the Confidentiality, Non-Competition, and Nonsolicitation Agreement executed by Defendant Henry Bailey on or about July 2, 2024.

5. Attached to the Verified Complaint as **Exhibit B** is a true and correct copy of the reminder letter transmitted to Mr. Bailey on or about March 3, 2026. Each of these documents is maintained by BrightView in the ordinary course of its regularly conducted business activity; each was made and kept at or near the time of the acts and events reflected therein by persons with knowledge of them; and it is the regular practice of BrightView to make and maintain records of this kind.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 26, 2026, at Charleston, SC.

*Katrina Albertson*

KATRINA ALBERTSON
HR Director
BrightView Landscapes, LLC

Dated: July 27, 2026

Respectfully submitted,

**DAVIS WRIGHT TREMAINE LLP**

*s/ Geoffrey S. Brounell*

Geoffrey S. Brounell (Bar ID No. 326522)
1251 Avenue of the Americas, 42nd Floor,
New York, NY 10020-1104
212.603.6404
geoffreybrounell@dwt.com

Jeremy Ben Merkelson (*Pro Hac Vice Submitted)*
Patrick T. Wilson (*Pro Hac Vice Forthcoming*)
1301 K Street NW, Suite 500 East,
Washington, D.C. 20005
202.973.4283
jeremymerkelson@dwt.com
patwilson@dwt.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2026, the Verified Complaint and exhibits thereto were filed electronically using the Court's ECF System and are available for viewing and downloading from that System. I further certify that a copy of the foregoing was given to a process server with instructions to personally serve Defendant Henry Bailey, at 412 Lake Moultrie Drive, Bonneau, South Carolina 29431 and served on his personal email address at hebjeb23@yahoo.com.

*/s/ Geoffrey S. Brounell*
Geoffrey S. Brounell